**<u>Exhibit A</u>**

**<u>Transcript of Motions Hearing in</u>**

**<u>City of Cuyahoga Falls v. Zachary Knotts, 2025CRB00069</u>**

**<u>Held on February 3, 2025 in Stow Municipal Court</u>**

IN THE STOW MUNICIPAL COURT
COUNTY OF SUMMIT

| | | |
|---|---|---|
| CITY OF CUYAHOGA FALLS, | ) | CASE NO. 2025CRB00069 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE LISA COATES |
| vs. | ) | |
| | ) | MAGISTRATE JOHN W. CLARK |
| **ZACHARY KNOTTS,** | ) | |
| | ) | Volume 1 (of 1 volume) |
| Defendant. | ) | |

- - -

**APPEARANCES:**

MATTHEW PLESICH, Assistant City Prosecutor,
    On behalf of the City of Cuyahoga Falls.

LIAM R. HARRELL and MARSHAL PITCHFORD,
Attorneys at Law,
    On behalf of the Defendant.


- - -


BE IT REMEMBERED that upon the hearing of

the above-entitled matter in the Stow Municipal

Court, Summit County, Ohio, before the **HONORABLE**

**JOHN W. CLARK**, Magistrate Presiding, commencing

February 3, 2025, the following proceedings

were had, being a Transcript of Proceedings:

**(MOTION TO DISMISS)**

KELLEY E. SPEARS, RPR
Court Reporter

```
 1    *****Monday, February 3, 2025
 2                   P R O C E E D I N G S
 3                        - - -
 4    (Whereupon,a discussion was held off the
 5    record.)
 6             THE COURT:  I know I granted you both
 7    leave to file anything else response-wise up
 8    until today.
 9             Anything new get filed since the
10    31st?
11             MR. HARRELL:  Nothing from defense,
12    Your Honor.
13             THE COURT:  So I think I have
14    everything now.  At least as I understand
15    the motion or the motions, the First
16    Amendment argument is primarily an oral
17    argument?
18             MR. HARRELL:  Your Honor, that is --
19    that is absolutely correct.  It's purely
20    facial.  We'll -- I think we'd like to take
21    maybe just a quick detour into an as-applied
22    argument, but primarily that's facial.  We
23    don't plan on introducing any evidence or
24    testimony.
25             THE COURT:  So as I understand it,
```

1          that's, for lack of a better term, that's an

2          oral argument?

3                    MR. HARRELL: Yes, sir.

4                    THE COURT: The other part of the

5          motion, however, or the other motion that's

6          going towards the enforcement part is an

7          evidentiary hearing?

8                    MR. HARRELL: Yes. And our

9          understanding is the sergeant is available

10         for testimony.

11                   So defense would, I guess, offer --

12         we could do the First Amendment challenge

13         first.

14                   THE COURT: Yeah, that's --

15                   MR. HARRELL: Okay.

16                   THE COURT: Yeah, that's my thought

17         that you guys argue that and then you move

18         into the evidentiary hearing as part of the

19         second -- what I'm considering the second

20         motion.

21                   MR. PLESICH: I mean, as far as the

22         motion to dismiss, the second part, I don't

23         think he needs a prima facie case to even

24         have an evidentiary hearing.

25                   THE COURT: Okay.

```
 1              MR. PLESICH:  I mean, there's two
 2         prongs that I believe shows that it was -- I
 3         think at the time he filed that motion, he
 4         wasn't aware of the 911 call, but I think it
 5         really relies on the fact that
 6         discriminatory purpose or in the effect of
 7         enforcement.
 8              THE COURT:  Okay.
 9              MR. PLESICH:  The fact that an
10         officer went out and investigated a crime
11         and charged somebody for a crime is a prima
12         facie case in and of itself that it was
13         discriminatory and it should be dismissed.
14              THE COURT:  All right.  Counsel,
15         anything you want to say in response to
16         that?
17              MR. HARRELL:  Your Honor, we did go
18         over briefly that -- we think our motion
19         does lie out the prima facie case.  Our
20         argument is not that the officers showed up
21         there out of the blue with a decision to
22         start citing people.  We concede that there
23         is a 911 call.
24              I think we did -- we even mentioned
25         the 911 call in our motion, though at the
```

1           time we had not received it, so we referred

2           to it as a, I think, alleged 911 call.

3                One moment here.

4                MR. PITCHFORD:  Just a brief

5           indulgence, Your Honor.

6                MR. HARRELL:  So we concede that the

7           911 call at this point is authentic.  We

8           have no reason to doubt that.

9                That being said, our argument is

10          essentially that the officer arrived at the

11          scene with sort of an inclination to cite

12          Mr. Knotts.  He was then presented with

13          evidence that other similarly situated

14          persons were also in violation of the

15          statute, but only elected to cite

16          Mr. Knotts, and we would argue due to

17          Mr. Knotts' exercise of constitutionally

18          protected speech.

19               MR. PLESICH:  Which is similar to the

20          scenario where an officer is doing a speed

21          detail and there's ten people speeding and

22          he decides to issue one ticket.

23               They have discretion, they used that

24          discretion that day, and the complaint in

25          that 911 call is specifically -- was very

1        specific as to who or what the noise

2        complaint was about.

3              THE COURT:  I don't know that I get

4        there without actually hearing it.  And I

5        guess at the end of the day, maybe I'll

6        change my mind.  That's not what I'll

7        (unintelligible) at this point just to err

8        on the side of having the evidentiary

9        hearing as opposed to err not having.

10       Any other -- anything else that needs

11       attention right now before we start the

12       hearing?

13            MR. PITCHFORD:  Is the sergeant here?

14            MR. PLESICH:  Yes.

15            MR. HARRELL:  Then I was --

16            MS. BANBURY:  I was going to go OFFER

17       to get him.  I'm one of the other

18       prosecutors.  I was just sitting here

19       checking out --

20            MR. HARRELL:  No, I was going to ask

21       the opposite.  We would have invoked the

22       wrong witnesses.

23           So with that said, as long as he's

24       outside the courtroom, nothing further.

25           THE COURT:  Is he the only witness we

1    anticipate?

2              MR. PLESICH:  Yes.

3              MR. HARRELL:  Yes.

4              THE COURT:  All right.  Very good.

5    All right.  Go ahead and get him or somebody

6    get him.

7              MS. BANBURY:  I'll get him and have

8    him sit outside (overlapping speakers) --

9              THE COURT:  No, your client's welcome

10   to come in.

11             MR. PLESICH:  Have him sit right

12   here.

13             MS. BANBURY:  All right.  And Chad --

14   we have an officer's son here from Cuyahoga

15   Falls shadowing, Chad's son.  Is it okay if

16   I bring him in?

17             THE COURT:  Okay.

18             MS. BANBURY:  Thanks.

19             THE COURT:  All right.  This is

20   2025CRB0069, State of Ohio vs. Zachary

21   Knotts.  Parties are all present today with

22   counsel.

23             We've had some preliminary

24   discussions on the record to the effect of

25   having a brief oral argument on the motion

1          to dismiss under the First Amendment.  We

2          will then proceed, at least at this point,

3          with an evidentiary hearing on the motion to

4          dismiss for retaliatory (inaudible).

5                All right.  Mr. Harrell, anything you

6          want to (inaudible) going forward with the

7          argument on your First Amendment argument?

8                MR. HARRELL:  Nothing, Your Honor.

9          Defense is ready.

10               THE COURT:  I'm sorry?

11               MR. HARRELL:  Nothing, Your Honor.

12         Defense is ready to make the argument.

13               THE COURT:  Go ahead.  Go ahead.

14               MR. HARRELL:  Would you prefer it

15         from the podium or here?

16               THE COURT:  Wherever you're

17         comfortable.  Just for the sake of the

18         hearing, you're welcome to get up and move

19         around, sit down, stand up.  I'm okay -- as

20         long as you're not hostilely approaching

21         anybody, I'm okay.

22               MR. HARRELL:  I think I can manage

23         that, Your Honor.

24               THE COURT:  All right.

25               MR. HARRELL:  I'm going to make a

```
1        brief argument, and I'll be frank, it is
2        largely a restatement of our motion.  I'll
3        have a few additional argument (inaudible).
4             The United States Supreme Court in
5        People of New York v Saia made it clear that
6        megaphones, what may call loudspeakers, are
7        indispensable instruments of effective
8        public speech.  And that really is what this
9        case is about, Your Honor.  It's about
10       political speech.  It is about public speech
11       in a public area.  This is the core of the
12       First Amendment.
13            You do not -- this is a very high
14       school civis class romantic view of the
15       First Amendment to go into a public space
16       and make your voice heard.  This is
17       absolutely protected speech.  That does not
18       mean that it is immune from any and all
19       government regulation.  That is not our
20       position.
21            Rather, when a law does implicate the
22       First Amendment, the -- as Your Honor, as
23       I'm sure you're aware, courts are supposed
24       to put different layers of scrutiny -- I'm
25       sorry -- I should say different levels of
```

1        scrutiny based on the nature of that

2        regulation.

3              The highest level of scrutiny is

4        strict scrutiny, which is a very exacting

5        standard.  And you'll be very hard pressed

6        to find any appellate precedent that finds

7        any law has met that exacting standard.  The

8        Supreme Court has listed a few of the

9        exceptions.

10              That does come into play when there

11        is a content-based discrimination.  That is

12        when the government does not nearly look at

13        the time-place-manner of speech, but

14        actually does goes into the type of -- the

15        content of the speech.

16              That's -- and, of course, the Supreme

17        Court's right to be very hostile to those

18        strict regulations.  That does get into

19        exactly what the First Amendment was

20        designed to stop; mainly censorship.

21              Now, the -- on first glance, the

22        ordinance at issue here does not necessarily

23        seem to discriminate on the basis of the

24        content.  However, there is a notable

25        exception to the application.  And that is

1        that it exempts governmental, educational,

2        religious, and charitable entities from

3        engaging in -- that the ordinance does not

4        apply to them on land owned by them or

5        anywhere else so long as the amplification

6        is done under the auspices of those

7        organizations.

8            So I want to be clear.  First, this

9        is not a place -- time-place-manner.  This

10       is not a place because the ordinance doesn't

11       say that charitable institutions can have

12       amplified speech on land owned or possessed

13       by them.  It says they can do it anywhere;

14       anywhere in the county as long as it's not

15       under the auspices of their organization.

16           So this is not a place restriction.

17       This is a speaker-based restriction.  And

18       the Supreme Court has actually explicitly

19       stated that a speaker-based restriction is,

20       of course, a content-based restriction.

21       Certain speakers tend to have certain types

22       of content.  You could not get around -- you

23       could not say well, the blue party gets to

24       speak, but not the red party.  Hey, we're

25       not looking at your content, we're just

1          looking at your speaker obviously.

2               In *Citizens United v FEC*, the Supreme

3          Court said that you cannot say that large

4          corporate entities are not allowed to speak,

5          but small individual entities are.

6               And certainly the same thing applies

7          here, if not more so, because we're actually

8          looking at the nature.  This is a

9          content-based.  Therefore, that exception

10         makes this ordinance a content-based

11         restriction.

12              Now, strict scrutiny is, very

13         briefly, there are the two prongs.  First,

14         it must serve a compelling state interest.

15         And this does not serve any compelling state

16         interest.

17              The Supreme Court, when discussing

18         compelling state interests, they were

19         talking about some of the most extreme

20         examples of speech; restricting information

21         -- the dissemination of information that

22         would put into jeopardy national security,

23         or prohibitions on child sexual abuse

24         material.  Those are compelling state

25         interests.  Volume is not, and there is no

1          precedent that would indicate otherwise.

2                  Additionally, it fails on the second

3          prong as well, which is that it must be

4          narrowly tailored.  When the Supreme Court

5          discusses narrow tailoring, they're talking

6          about that you're leaving a handful of other

7          opportunities for speech that you are not

8          including protected -- any unnecessarily

9          precluding, I should say, protected speech

10         in your gamut; that you are really being

11         sensitive to narrowly attacking the type of

12         speech you wish to restrict.

13                 Certainly national security is a

14         compelling interest, but you could not ban

15         an entire newspaper on that basis.

16                 So the ordinance is not strict

17         scrutiny.  Strict scrutiny is required

18         because this is a content-based restriction.

19                 I'm going to also just briefly tack

20         on an argument about an as-applied

21         challenge.  If Your Honor were to find that

22         this ordinance does meet constitutional

23         scrutiny, even an otherwise legitimate

24         constitutional law can still be

25         unconstitutional as applied if the way it

1      was used creates the same constitutional

2      issues.

3              Now, certainly her position is that

4      it doesn't even meet the -- doesn't even

5      pass the facial challenge so we shouldn't

6      get there.

7              But if Your Honor were to find that

8      it does meet that facial challenge, and the

9      government (unintelligible) applied

10     challenge, then the defense is going to

11     proffer that the way the Cuyahoga Falls

12     Police Department went about their job in

13     showing up and looking at someone who is

14     using a megaphone to make his political

15     speech heard and then punishing him for

16     that, even if that might technically satisfy

17     a statute, this is protected speech.  This

18     is what the First Amendment protects.

19             Again, the amplification at issue has

20     been specifically addressed by the Supreme

21     Court, and they have found that it was not

22     just included in the First Amendment, but

23     they used the word indispensable instruments

24     of protected speech.

25             While certainly the defense would

1           concede that there is some sort of limit if

2           you were being so loud as to deafen the

3           people around you or cause physical injury,

4           we're not going to argue that that would

5           necessarily be protected speech.

6                   But we are talking about a small

7           battery operated megaphone.  I am getting

8           into the fact (unintelligible) agreed upon.

9           This -- the way -- even if Your Honor were

10          to find the statute meets -- passes the

11          facial challenge, certainly the way it's

12          applied this time.

13                  Promised it would be a brief

14          argument.  That's all I have.

15                  THE COURT:  All right.  Thanks,

16          Counsel.

17                  Mr. Plesich.

18                  MR. PLESICH:  Thank you, Your Honor.

19          In response to that, I'm going to focus on

20          the -- not on the message, but on the noise,

21          because I think this is what this is really

22          about.

23                  *Ward v Rock* (unintelligible) states

24          that municipalities may impose

25          time-manner-place restrictions on protected

16

1          speech provided that they are content

2          neutral, narrowly tailored, and leave open

3          ample alternatives for communicating that

4          message.  And that's exactly what this

5          statute does in practice and on paper.

6               The fact that protecting citizens

7          from unwanted noise has been repeatedly held

8          to be a content-neutral justification for

9          laws.  And there's two cases, *State v Dorso*

10         and *Boos v Barry*.

11              And so there is a significant

12         government interest here to protecting

13         citizens from unwanted noise.  And that's

14         exactly what was recorded and charged that

15         day based on the report.

16              The fact that this very narrowly

17         tailored ordinance (unintelligible)

18         significant government interest and the

19         State may act to protect even traditional

20         public forums such as streets and parks from

21         excessive noise.  And that's also *Ward v*

22         *Rock Against Racism*.

23              And in this particular case, a third

24         prong alternative -- ample alternatives.  If

25         you look at the facts of this case, it's

1          been out there prior to and after this issue

2          has come up again.  They've been getting

3          their message out as they wished to get it

4          out leaving ample alternatives.

5                    By dismissing this action, it would

6          basically cripple cities from imposing any

7          strict restrictions on noise.  I think the

8          Defendant's mislead into believing that the

9          officers were out there trying to stifle the

10         message.

11                   They got a specific report.  It was

12         about loud noise.  They went out and

13         investigated that noise.

14                   They did look at both sides of the

15         issue.  He claimed that there's another side

16         out there creating some type of noise.  That

17         may be true.  That's not the complaint that

18         came into the station, and that's not the

19         complaint that was investigated.

20                   When they got there and investigated,

21         they didn't just walk up, charge this

22         individual for any reason other than the

23         megaphone that was reported.  They did

24         review other people that were out there

25         creating some type of noise and determined

1      that that didn't rise to the level of any

2      charges.

3              THE COURT:  All right.  Brief

4      rebuttal?

5              MR. HARRELL:  Thank you, Your Honor.

6      I'd like to just real quick touch on *Ward v*

7      *Rock Against Racism*.  The -- that case had

8      to do an intermediate scrutiny analysis

9      because the Supreme Court had found that it

10     was a time-place-manner restriction.

11             Even those get a heightened level of

12     analysis, intermediate scrutiny.  But the

13     reason that the court is using the word

14     significant government interest rather than

15     compelling is just that.

16             When you are engaging in a

17     content-based restriction, which *Ward v Rock*

18     *Against* found not to have been, then -- when

19     you are engaging in the content-based, you

20     get the highest level of scrutiny, strict

21     scrutiny, and it goes from merely being a

22     significant government interest to a

23     compelling government interest.

24             And then I would just again point out

25     that the idea that this ordinance leaves

1          ample opportunity for alternative speech, I

2          think that's really a point in question,

3          because without any sort of amplification,

4          it is not clear what -- again, assuming that

5          what the Supreme Court said in Saia is

6          correct, that Mr. Knotts' political speech

7          is entitled to some degree of amplification,

8          it's not clear on the current wording of the

9          statute how it is you get to the ample

10         opportunity for other types of speech.

11              THE COURT:  All right.  All right.

12         Then we'll move on to the discriminatory

13         enforcement.

14              You think we need any opening

15         argument for that, or we -- or opening

16         statement for that, or you just want to jump

17         in and reserve it all for closing?

18              MR. PLESICH:  I don't need any

19         opening.

20              MR. HARRELL:  We're fine to reserve,

21         Your Honor.

22              THE COURT:  Yeah, I'm thinking it's

23         probably better as a wrap-up then a -- all

24         right.

25              Officer, I'm going to have you raise

1           your right hand for me.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          BRAD DOBNEY

2              a witness herein, called on behalf of the

3              Defendant, having been first duly sworn as

4              provided by law, was examined and testified

5              as follows:

6                    THE WITNESS:  Yes, Your Honor.

7                    THE COURT:  All right.  And have a

8              seat there on that blue bench.

9                    As soon as he gets settled, you can

10             proceed, Counsel.

11                       DIRECT EXAMINATION

12   BY MR. HARRELL:

13   Q.    Good afternoon.

14   A.    Afternoon.

15   Q.    Do you mind telling us your name and what

16         you do for a living?

17   A.    I'm Sergeant Brad Dobney, badge number

18         7194, of the Cuyahoga Falls Police

19         Department.

20   Q.    And how long have you been with the

21         Cuyahoga Falls Police Department?

22   A.    Seven years, and I'm going to say like

23         seven-ish months.

24   Q.    And -- let's see.  And how -- of those

25         seven years, how long -- how many of those

```
 1              have been as a sergeant specifically
 2              (inaudible)?
 3    A.        None of the years.  About four months.
 4    Q.        Well, congratulations.
 5                   And were you -- let's see.  I
 6              apologize.  Brief apologies, Your Honor.
 7                   Were you working in that capacity
 8              on December 28th -- I want to make sure I
 9              got that day right -- of 2024?
10    A.        Yeah.  The 28th of December of '24, I
11              would have been a sergeant by then, yes.
12    Q.        And did you have the opportunity to
13              investigate my client, Mr. Zach Knotts,
14              for any infractions?
15    A.        I responded to a call, yes.
16    Q.        All right.  And what exactly was the
17              nature of the call that you heard?
18    A.        The call that I heard go out over the
19              radio and then checked on the call notes
20              on my screen was for a report of a man
21              with a megaphone making noise at the
22              women's clinic.
23    Q.        Did you learn the nature of the report,
24              how the report had been made, or --
25    A.        I'm -- I'm not tracking with you.
```

```
 1    Q.    Did you know it was a 911 call at the
 2          time?
 3    A.    The call just shows up on my screen, sir.
 4          Dispatch gives it to me, I read the call
 5          notes.
 6    Q.    Okay.  And to the best of your
 7          recollection, what did the call notes say?
 8    A.    The call notes said that there was a male
 9          with a megaphone making noise at the
10          corner there near the women's clinic and
11          that the caller was annoyed by that and
12          wanted it checked out.  The best of my
13          recollection.  I can't quote the call
14          notes for you, sir.
15    Q.    That's fine.
16          Do you remember if there's any
17          other physical description of the suspect
18          other than male?
19    A.    I don't recall.  I don't believe there
20          was.
21    Q.    And what was the location again?
22    A.    The women's clinic, sir, on State Road.
23    Q.    Okay.  Are you familiar with the Women's
24          Clinic?
25    A.    I know where it is.  It's in my city.
```

24

```
1    Q.     Do you know what types of -- do you know
2           what types of procedures are performed
3           there?
4    A.     I have at best a vague understanding.
5    Q.     Can you tell us what that vague
6           understanding is?
7    A.     It's -- I understand it's a women's
8           clinic.  I believe -- I've never even been
9           inside the doors.  Honestly, I can tell
10          you what I've heard it does, but it would
11          be speculation on my part.
12   Q.     What have you heard that it does?
13   A.     I've heard that they perform abortions
14          there and also help pregnant women find
15          other resources.
16   Q.     Okay.  And to be clear, had you heard that
17          before or after December 28th?
18   A.     Before, sir.
19   Q.     Okay.  Do you remember approximately what
20          time you arrived -- well, first, did you
21          proceed to the women's clinic?
22   A.     Yes.  I added myself onto the call -- I
23          was not initially dispatched to it -- and
24          went there.
25   Q.     Okay.  And do you recall approximately
```

```
 1              what time you went there?
 2   A.         It would've been before noon, sir, but I
 3              can't tell you the time.
 4   Q.         And can you please describe the scene of
 5              the women's clinic when you arrived?
 6   A.         Yeah.  Patrolman Oldman [sic] heard
 7              (unintelligible) -- Oldham was there.
 8              Patrolman Paratore I believe arrived right
 9              around the same time I did as Patrolman
10              Bullock.
11                      We walked up.  There was a group of
12              people in front of the clinic like near
13              the doors, and then a group of people out
14              on the sidewalk.
15   Q.         Were you alone or did you have a partner
16              with you?
17   A.         I believe I walked up with Paratore, sir.
18   Q.         With Paratore?
19                      So including you and Paratore, how
20              many uniformed Cuyahoga Falls Police
21              Department officers were at that location?
22              And I'm (inaudible) at the door
23              (unintelligible).
24   A.         There would've been four of us.  There
25              would've been me, Bullock, Paratore and
```

```
 1            Oldham.

 2    Q.      And then were there any Cuyahoga Falls

 3            Police Department officers not

 4            (inaudible)?

 5    A.      No, sir.

 6    Q.      Okay.  All right.  What did you do next to

 7            proceed with your investigation?

 8    A.      As I knew I was looking for a male with a

 9            megaphone, I identified a male with a

10            megaphone.  I then walked over and spoke

11            with Patrolman Oldham, asked him as to

12            what was going on, tried to verify the

13            complaint that had come in.  I'm sorry.

14                 I was able to verify the complaint

15            that come in, and he told me that he had

16            recorded it.  We proceeded with a

17            disorderly conduct.

18    Q.      Did you view or otherwise receive that

19            recording?

20    A.      Of his recordings?

21    Q.      Yes, it's Oldham's recordings?

22    A.      At some point in time that day I had seen

23            a recording.  I can't tell you if I saw it

24            on his phone or if somebody else had it.

25    Q.      Did you see a recording before or after
```

```
 1              the citation of Mr. Knotts?

 2    A.        It had been before.

 3    Q.        Okay.  And to the best of your knowledge,

 4              that was Officer Oldham's -- is that

 5              right, officer or patrolman?  Sorry.

 6    A.        We use them interchangeably.  Technically

 7              per our contract we're patrolmen, sir.

 8    Q.        Okay.  Is that -- and to the best of your

 9              knowledge, the recording you saw had been

10              recorded by Patrolman Oldham?

11    A.        The best of my knowledge.  I can't swear

12              to that.

13    Q.        All right.  Did you speak with any other

14              -- and let me be clear.

15                   Before the issuance of the

16              citation, did you speak with any other

17              witnesses or learn anything else about my

18              client's alleged actions?

19    A.        I don't believe so, sir.

20    Q.        All right.  So when you arrived, you saw

21              my client, and you're saying with a

22              megaphone?

23    A.        Yes, sir.

24    Q.        Did you see my client use the megaphone?

25    A.        No, sir, I did not.
```

```
 1   Q.    All right.  So you saw my client with the

 2         megaphone.  You spoke to Patrolman

 3         Oldham --

 4   A.    Uh-huh.

 5   Q.    -- and you observed the recording that to

 6         the best of your knowledge had been

 7         recorded by?

 8   A.    Yes, sir.  I believe his report also

 9         indicates that he recorded things on his

10         body cam as well.  I was not able to view

11         those at the time.

12   Q.    Okay.  Were you aware that he had made

13         those recordings?

14   A.    Yes, sir.

15   Q.    Did you have any other reports of any

16         other disorderly conduct?  And I don't

17         mean necessarily in the strict legal

18         definition.  Let's use more generally.

19              Any conduct that would warrant a

20         citation?

21   A.    I just had the call, sir.

22   Q.    You had not heard any reports or comments

23         about threats or other noisy activity?

24   A.    Not until I arrived on scene, sir.

25   Q.    Okay.  And did you hear any after you'd
```

1           arrived on scene?

2    A.    I believe it was the Defendant's wife said

3          that other people had been making noise as

4          well.

5    Q.    Is that the only substance of the

6          (unintelligible) that you remember?

7    A.    She said something about them saying

8          threatening things as well, I believe.

9    Q.    In Cuyahoga Falls, is there any ordinance

10         that you're aware of that would make

11         threatening behavior actionable or

12         something you can cite?

13   A.    It would have to rise to the level of

14         menacing, sir.

15   Q.    Can you please describe what your

16         understanding of menacing is?

17   A.    Menacing would have to be an actionable

18         threat that people perceived as a threat

19         and was not offered conditionally.

20   Q.    This woman who you believe to be the

21         Defendant's wife, did her report rise to

22         that level in your opinion?

23   A.    No, sir.

24   Q.    Did you ask any follow-up questions to

25         determine if that behavior might rise to

```
 1            that level?
 2     A.     I gave -- went with the fact pattern she
 3            gave me, sir.
 4     Q.     Other than my client, his wife, and the
 5            four officers, was anyone else that you
 6            remember on scene?
 7     A.     There were quite a few people there, yes.
 8     Q.     Can you tell me about some of the people
 9            you remember?
10     A.     I know that there was a group of people
11            near the door.  I do not know any of their
12            names.  And I know that there was group of
13            people on the sidewalk.
14     Q.     Let's start with that group of people by
15            the door.  Can you describe them?  Did
16            they appear to be in a group?
17     A.     Yes.
18     Q.     Okay.  How did you know they were together
19            in a group?
20     A.     They were all standing together in a
21            group.
22     Q.     Were they -- were there any other
23            indications they were together?
24     A.     I mean, they were a group of people
25            together.  I'm not quite certain what
```

```
 1              you're looking for.  They weren't wearing
 2              matching uniforms or bracelets or
 3              something that said we're a group.
 4    Q.        There was no matching uniforms?
 5    A.        They have -- they might have had traffic
 6              vests or something like that on.  Maybe
 7              orange shirts.
 8    Q.        Okay.  Did -- did all of them have orange
 9              traffic vests on?
10    A.        I couldn't tell you that.
11    Q.        Was this proof of people doing anything
12              else that you remember other than wearing
13              orange vests?
14    A.        They were hanging out near the door
15              (overlapping speakers) -- no, go ahead.
16    Q.        Were they making any noise?
17    A.        While we were there -- and apologies.
18              I've been out there several times, so I
19              can't remember on that specific situation.
20              I don't remember if they were yelling back
21              and forth that time or other times I've
22              been out there, but they weren't standing
23              there silently, no.
24    Q.        Did they have any instruments or other
25              means of amplification to your knowledge?
```

```
 1    A.    Again, sir, I've seen them with kazoos
 2          before.  Whether they had them
 3          specifically on the 28th of December, I
 4          don't know.
 5    Q.    Anything else you remember about that
 6          group?
 7    A.    I think they had umbrellas.
 8    Q.    All right.  I'd like to talk about the
 9          other group, you said the group on the
10          sidewalk.
11    A.    Yes, sir.
12    Q.    Was -- who do you know was in that group?
13    A.    Your client, sir.
14    Q.    Anyone else?
15    A.    I'm assuming that his wife had initially
16          stood there.  I think I made contact with
17          her over by Patrolman Paratore's car.
18    Q.    Anyone else?
19    A.    Not that I could identify, sir.
20    Q.    Okay.  And did anything stand out to you
21          about this group of people?
22    A.    They were -- like I said, the groups were
23          verbally interacting with each other.
24          They did not seem to be friends.
25    Q.    I understand.
```

33

1          What, if anything, do you remember
2          about the verbal interactions?
3    A.    They were hostile.
4    Q.    Were they political in nature?
5    A.    At that point in time they were just
6          yelling back and forth at each other.  The
7          content of it I'm not entirely certain.  I
8          was trying to help Patrolman Paratore.
9    Q.    Did you have any inclination as to what
10         those arguments were about?
11   A.    I'm fairly certain that one side was pro
12         choice and the other side was pro life.
13   Q.    Did you speak -- well, let's back up.
14              You spoke with Patrolman Oldham?
15   A.    Yes, sir.
16   Q.    I think you've done a good job describing
17         the scene as you approached it.
18              Did you speak with -- and I may
19         have asked this already, I apologize.  Did
20         you speak with anyone other than Patrolman
21         Oldham between when you arrived and citing
22         my client?
23   A.    I'd have to watch my body cam, sir.
24   Q.    Understood.  What happened after you cited
25         my client?

```
 1   A.    I didn't cite your client.

 2   Q.    Oh, sorry.

 3               Was my client cited?

 4   A.    Yes, sir.

 5   Q.    By whom?

 6   A.    Patrolman Paratore.

 7   Q.    Patrolman Paratore.

 8               And that was just -- from my

 9         recollection, that was the partner I think

10         you had arrived with.  Is that true?

11   A.    He and I walked up together.  Sir, we

12         don't work in partners in Cuyahoga Falls.

13   Q.    Understood.  Were you present when

14         Patrolman Oldham cited Mr. Knotts?

15   A.    Patrolman Paratore?

16   Q.    Thank you.

17               Were you present when Patrolman

18         Paratore cited --

19   A.    I was standing outside the vehicle with

20         Patrolman Bullock and the woman I believe

21         is Mrs. Knotts.

22   Q.    After Mr. Knotts was cited, did you

23         continue to investigate anyone else at

24         that scene?

25   A.    They -- I believe they left the scene.  I
```

```
 1              wished them to have a safe day.  I spoke
 2              with Patrolman Oldham again.  I spoke with
 3              the people at the front door, advised them
 4              of the reason for the citation.
 5    Q.        Why did you speak to the people at the
 6              front door?
 7    A.        Because I wanted to talk to them, too, to
 8              keep this from rising to some sort of
 9              fight.
10    Q.        What did you tell -- what specifically do
11              you remember that you told the people at
12              the door?
13    A.        I cannot specifically quote myself.
14    Q.        Do you remember if they told you anything?
15    A.        I think they conveyed that this has been
16              going back and forth for a while.  But
17              again, these incidents have kind of run
18              together.
19                   MR. HARRELL:  Your Honor, may I have
20              a brief moment to confer?
21                   THE COURT:  You may.  Certainly.
22                   MR. HARRELL:  We are -- no further
23              questions at this time, Your Honor.
24                   THE COURT:  All right.  Mr. Plesich.
25                   MR. PLESICH:  Thank you.
```

```
 1                        CROSS-EXAMINATION

 2    BY MR. PLESICH:

 3    Q.    Sergeant Dobney, now, you testified that

 4          you were responding to a 911 call that

 5          day?

 6    A.    Yes, sir, a dispatched call.

 7    Q.    And a call came across your screen

 8          (inaudible).  Have you since learned where

 9          that call came from?

10    A.    I believe I was told that it was an

11          anonymous caller who lived nearby.

12    Q.    Okay.  So somebody from in their home?

13    A.    That's what I've been lead to believe,

14          yes, sir.

15    Q.    Okay.  And prior to that incident, I think

16          were you out there earlier that day at

17          all?

18    A.    Again, these start to run together in my

19          head.  I may have been.

20    Q.    Have you been out there in the past?

21    A.    I have been, yes.

22    Q.    How many times in the past have you been

23          out there through the years?

24    A.    Through the years, not as many because

25          I've worked nights, thankfully.  Recently
```

1               probably just about every Saturday.

2     Q.        Okay.  And what's the mood and the

3               atmosphere out there?

4     A.        Charged.

5     Q.        Charged?

6     A.        Yes.

7     Q.        Does that concern you in any way as a

8               police officer?

9     A.        It does, yes.

10    Q.        And why?

11    A.        I don't want to see -- I've been told that

12              some of the people out there are armed.  I

13              don't want to see any sort of violence

14              occur, certainly not next to

15              a (inaudible).

16    Q.        And what is the nature of that area

17              through there?

18    A.        High traffic.  Busy.  It's a business

19              area.

20    Q.        But you testified there's a home nearby?

21    A.        Yeah.  Backed up off the other side of

22              State Road is a residential area that sits

23              almost directly behind the businesses that

24              are there.

25    Q.        Now, are you aware of any other reports

1        that came out that morning regarding that

2        location?

3    A.  I am not.

4    Q.  You were on duty though?

5    A.  Yes.

6    Q.  Would you have heard it if it did come

7        out?

8    A.  Yes.

9    Q.  And you were the sergeant on duty?

10   A.  Yes.

11   Q.  And so that particular day you were

12       responding specifically you testified to

13       someone with a megaphone?

14   A.  Yes.

15   Q.  And through the course of your experience

16       and duties, what would you do to

17       investigate or deal with that situation?

18   A.  Generally with a call like that that comes

19       in, we try to verify if it's true to begin

20       with; you know, look for somebody that has

21       a megaphone, speak with somebody else on

22       scene.

23            Obviously I chose another police

24       officer that was on scene because I trust

25       Patrolman Oldham, and verify that the

```
 1              things that had been reported he had also
 2              seen, and went from there.
 3    Q.        So let's back up a second.
 4                   The 911 came in as a noise
 5              complaint, right?
 6    A.        Yes.
 7    Q.        Now -- and was it anonymous you said?
 8    A.        I believe so.
 9                   MR. HARRELL:  Objection, Your Honor.
10              At this point, things that the officer
11              learned after the citation really aren't
12              relevant.
13                   MR. PLESICH:  I think he testified to
14              that earlier.
15                   THE COURT:  All right.  I'll allow
16              it.
17                   Go ahead.
18    BY MR. PLESICH:
19    Q.        So with the noise complaint, I'm going to
20              scratch that.
21                   So you go out and investigate any
22              type of call that comes in?
23    A.        Yeah.
24    Q.        You rely on the 911 call to sign charges?
25    A.        No.
```

```
1    Q.    So what do you do to get to that point?

2    A.    We go verify that what the 911 caller or

3          our dispatch call is reporting has

4          actually happened.

5    Q.    So you went out to this location and you

6          saw some things.  Did you hear anything?

7          Did you hear the megaphone?

8    A.    I did not hear the megaphone.

9    Q.    And how many people out there had a

10         megaphone?

11   A.    One.

12   Q.    So what did that lead you to believe?

13   A.    That he was the one the call was about.

14   Q.    Okay.  And so when you went out there, was

15         he not using it at that point?

16   A.    I believe he had it down by his side.

17   Q.    And had you had any other interactions

18         with this individual prior to then?

19   A.    Never met him before.

20   Q.    You never met him, didn't know him?

21   A.    I had no idea who he was, sir.

22   Q.    And you've investigated noise complaints

23         before, correct?

24   A.    Yes.

25   Q.    And what do you base your determination on
```

```
 1              when you make a determination to cite

 2              somebody for a noise complaint?

 3     A.       My knowledge of the ordinance.  Again,

 4              whether it's something that we can verify,

 5              especially if it just comes in as a call,

 6              there's not somebody standing there.  And

 7              whether it's verified and then whether it

 8              violates the ordinance.

 9     Q.       And so there were some allegations of

10              other individuals being noisy out there.

11              And did you investigate that?

12     A.       We looked into it, but again, we had not

13              received any calls about that.

14     Q.       It sounds like you spoke to a lot of

15              people out there that day?

16     A.       I -- yeah.

17     Q.       And there were other officers out there

18              and they spoke to these individuals?

19     A.       Yes.

20     Q.       Did they issue any other citations based

21              on their conversations?

22     A.       No.

23     Q.       How many citations were issued that day?

24     A.       One.

25     Q.       And do you know what was being said
```

```
 1              through the megaphone?

 2    A.        I have no idea.

 3    Q.        And would that have changed your

 4              decision --

 5    A.        No.

 6    Q.        -- on a citation?

 7    A.        No.

 8    Q.        What was the focus of your citation that

 9              day?

10    A.        To address the call for service that come

11              in, the complaint noise being made, and to

12              take enforcement action to make that stop.

13    Q.        And as far as you know, did that noise

14              complaint come from that property?

15    A.        From somebody on that property?

16    Q.        Or the center itself?

17                   MR. HARRELL:  Objection.

18              Speculation.

19                   THE COURT:  Sustained.

20    BY MR. PLESICH:

21    Q.        Are you aware of where that call came

22              from?

23    A.        I am now, yes.

24                   MR. PLESICH:  No further questions.

25                   THE COURT:  All right.  It seems odd
```

1    to say redirect to the person that's not the

2    prosecutor, but go ahead.

3         MR. HARRELL:  Our witness.

4         THE COURT:  Yeah.  A little

5    different.

6              REDIRECT EXAMINATION

7    BY MR. HARRELL:

8    Q.   Sergeant, I am kind of confused.  Hoping

9         you can clarify some things.

10   A.   Okay.

11   Q.   I'm going to go -- my colleague on the

12        other side asked if you had received other

13        noise complaints, and you said that you

14        had looked into it; is that right?

15   A.   Looked into whether I'd received other

16        ones?

17   Q.   That you had received other noise

18        complaints, and you said you looked into

19        them?

20   A.   Yeah.

21   Q.   Earlier I asked if you had received other

22        complaints, and to my recollection, you

23        told me the only one you recalled was

24        Mr. Knotts' wife?

25   A.   Yes.

44

1    Q.    Is that right?

2    A.    Yeah.

3    Q.    Are there any other noise complaints

4          otherwise on December 28th that you are

5          aware of?

6    A.    Are you talking about other calls for

7          service?

8    Q.    Any complaint you received or were aware?

9    A.    I was aware of the one that was the reason

10         I went there.  And then as I mentioned to

11         you, your client's wife also complained

12         about the noise the other people were

13         making.

14   Q.    All right.  So when the prosecutor asked

15         you about their investigations and you

16         said you looked into it, to which

17         allegations were you referring?

18   A.    I'm not following what you're asking me

19         here.  I've said those are the two that

20         I'm aware of.

21   Q.    Again, when the prosecutor asked you did

22         you hear other noise complaints and did

23         you look into them, you responded you

24         looked into it; is that correct?

25   A.    That's in reference to the ones that

```
 1              Mrs. Knotts made.

 2    Q.        All right.  But earlier when I asked you

 3              if you asked any follow-up questions, you

 4              told me you went with the facts you had,

 5              which were the threats did not lead to

 6              that menacing level.

 7                   So I guess my question is is to

 8              what -- what does that mean you looked

 9              into?

10    A.        Are you asking about noise complaints or

11              are you asking about menacing?

12    Q.        Let's back up.

13                   How many complaints, any specie,

14              did -- do you remember from December 28th?

15    A.        I received one call for service.

16    Q.        Okay.

17    A.        And then I received two that had no

18              grounds, one for, I guess, threats, if

19              that's what you want to call it, and one

20              complaining about the other people there.

21    Q.        And this is the case that you looked into

22              the call for service, and that would be --

23              by looked into, I mean, you identified the

24              man with the megaphone, asked for

25              corroborating evidence?
```

```
 1    A.    I investigated the call for service, yes.

 2    Q.    Did you investigate Mrs. Knotts'

 3          complaints too (inaudible)?

 4    A.    Neither of those rose to the level that

 5          required more than just standing there and

 6          observing what I could observe looking

 7          into it.

 8    Q.    Okay.  So by looking into it -- I want to

 9          clarify -- you mean standing there and

10          perceiving it?

11    A.    Talking with her, yes, and perceiving.

12    Q.    I just want to be clear about the nature

13          of the two investigations.  Thank you.

14              Also when the prosecutor asked you

15          if you spoke to a lot of others, I think

16          that also confuses me.

17              I remember you speaking to

18          Mrs. Knotts.

19    A.    Uh-huh.

20    Q.    I remember you speaking to Patrolman

21          Oldham --

22    A.    Uh-huh.

23    Q.    -- And viewing his video.

24              I also, I guess, remember you

25          speaking to the group at the door
```

```
 1              afterwards?

 2       A.     Uh-huh.

 3       Q.     Are there any others that you spoke with?

 4       A.     Just Paratore and Bullock, sir.

 5       Q.     Okay.

 6       A.     I don't --

 7       Q.     Now, finally he asked if you were familiar

 8              at all with the words that my client may

 9              have been using in the megaphone?

10       A.     Correct.

11       Q.     And you said you had no idea?

12       A.     None.

13       Q.     Earlier when I asked you if you thought

14              that the conversation might be political,

15              you mentioned you were fairly certain that

16              one side was pro life, one side was pro

17              choice?

18       A.     Yes.

19       Q.     How are you certain?

20       A.     Like I said, I'm fairly certain so I --

21              but I could, I guess, deduce from the

22              signs that the one group was holding that

23              they are pro life, and given the hostile

24              attitude towards the other group, could

25              deduce that the other side was pro choice.
```

```
 1    Q.    So you did have some idea what he would

 2          have been saying?

 3    A.    No clue what he said into the megaphone.

 4    Q.    I'm not asking you to -- I'm not asking

 5          you to speculate right now what he would

 6          have said.  I guess I'm asking, wouldn't

 7          the same things that have brought you to

 8          the conclusion that one side was pro

 9          choice, one side was pro life, wouldn't

10          those same factors have given you an idea

11          of what Mr. Knotts had been saying in the

12          megaphone?

13    A.    Again, sir, I responded to a noise

14          complaint of a man with a megaphone.  I

15          did not observe what he was saying into

16          the megaphone.  I verified the noise

17          complaint.  Patrolman Paratore took

18          enforcement action.

19                MR. HARRELL:  Thank you.

20                THE COURT:  Recross?

21                        RECROSS-EXAMINATION

22    BY MR. PLESICH:

23    Q.    The words that were spoken, did that come

24          into factor as a factor for you citing

25          this individual?
```

```
 1   A.      Patrolman Paratore citing him, not at all.

 2                  MR. HARRELL:  Your Honor, we are -- I

 3           assume we're done with this witness, and the

 4           defense has nothing else, Your Honor.

 5                  THE COURT:  Very good.  All right.

 6           You can step down, Patrolman.  Thank you.

 7                  THE WITNESS:  Thank you, Your Honor.

 8           (Witness excused.)

 9                  MR. HARRELL:  Your Honor, I would

10           again ask that we -- assuming that he would

11           be a likely witness in trial, we would ask

12           you to invoke that rule.

13                  THE COURT:  I'm sorry.  I didn't hear

14           the end of that with the door.

15                  MR. HARRELL:  Sorry.  We'd like to

16           invoke the rule on witnesses with regards to

17           the sergeant for any argument.

18                  THE COURT:  All right.

19                  Officer, you can go ahead and step

20           out.  We'll come get you if we need you.

21                  And as soon as he gets out, you can

22           proceed, Counsel.

23                  MR. HARRELL:  Thank you.

24                  Your Honor, as we argued in our

25           brief, the issue here -- I want to be clear
```

1              -- I guess let me start (unintelligible).

2                    THE COURT:  Okay.

3                    MR. HARRELL:  So we're not arguing

4        police officers or prosecutors are devoid of

5        their discretion.  Especially in the case of

6        prosecutors, they're elected officials.  We

7        understand that they live in a world of

8        limited resources, policy to be made.

9              However, this is clear that the types

10       of factors you can include to be

11       constitutionally permissible, I think the

12       quintessential examples would be race or

13       sex.

14             If an officer sees ten people

15       speeding and he elects to pull over only the

16       black ones, that is, of course, a violation

17       of equal protection clause, whereas other

18       types of -- and I believe we mentioned a

19       list of some factors the courts have found

20       permissible, including notoriety with

21       something that is constitutionally

22       permissible.

23             Here we are looking at the sergeant's

24       investigation tactics.  And I think his

25       testimony was really telling.  When asked at

1           a surface level what he did with other

2           complaints, he mentioned he looked into it.

3           But on the original examination and on cross

4           -- or sorry, redirect, Your Honor -- he

5           looked into it, it involved in his own words

6           standing there.

7                 And I think that really is our case

8           in a nutshell.  With the -- the officer

9           received two complaints which are both

10          covered under the same ordinance.  And for

11          one complaint, the officer surveilled the

12          scene.  The officer mentioned that he

13          located someone who was a likely fit; that

14          he interviewed other officers, and he --

15          once -- once Officer Paratore was

16          sufficient, who he mentioned was not his

17          formal partner, but he arrived with him at

18          the scene, once Officer Paratore had been

19          sufficiently apprised of that situation,

20          they cited Mr. Knotts.

21                In contrast, the sergeant testified

22          that his investigation of the other

23          complaints involved standing there.

24                I'm not an officer, I've never been

25          an officer, I don't claim to be an expert on

1          the case, but this court can absolutely find

2          that that is -- that demonstrates the issue

3          here, which is not that the Cuyahoga Falls

4          Police Department can't cite you for

5          violation of an ordinance, but what Cuyahoga

6          Falls did cite for violating an ordinance on

7          that day, that the only conceivable

8          difference between these two similarly

9          situated individuals was that one was

10         engaged in constitutionally protected

11         speech; was that one was exercising their

12         civil liberties.

13                That -- and again, the courts have

14         made that clear is not a permissible factor

15         to include when considering an investigation

16         and a prosecution decision.

17                So we are not asking this court to

18         micromanage the day-to-day actions of police

19         officers.  Courts at all levels have, I

20         guess, warned against sort of that

21         (unintelligible) quickly, that kind of

22         micromanagement is not authorized by the

23         constitution, nor is it particularly wise.

24                However, when the only conceivable

25         difference between two similarly situated

1           people is a constitutionally impermissible

2           factor, mainly the exercise of rights, then

3           the equal protection order clause of the

4           14th Amendment demands that this prosecution

5           be dismissed with prejudice.

6                Thank you.

7                THE COURT:  All right.  Mr. Plesich.

8                MR. PLESICH:  Oh, I would just say

9           the complaint that came out was for noise.

10          It was from a third party.  Once the officer

11          gets there he does investigate and

12          determines there's a megaphone causing this

13          noise.  To go out there and have now a

14          complaint from the other side suggests that

15          the speech from the other side, that

16          somehow should also be charged is

17          ridiculous.  It's almost like I'm getting

18          charged so why aren't they getting charged.

19                My officers have discretion, but they

20          also have their expertise and training and

21          experience.  And the fact he was out

22          there --

23                MR. HARRELL:  Objection.  Assumes

24          facts not in evidence.  There's no testimony

25          to expertise.

1          MR. PLESICH:  Well, he's suggesting

2     -- he's criticizing in his closing my

3     officer's technique of investigating the

4     crime that he claims the other side made.

5     So that is an officer --

6          THE COURT:  It's closing.  I'll allow

7     it.

8          Go ahead.

9          MR. PLESICH:  Well, he brought it up

10    in his closing.

11         THE COURT:  Yeah.

12         MR. PLESICH:  And I'm just

13    pointing --

14         THE COURT:  Right.

15         MR. PLESICH:  -- that fact out.

16         So at the same time, I would also

17    suggest that both sides had the right to be

18    out there speaking their minds, not just

19    their side, not just the Defendant.  And it

20    was not until the megaphone was introduced

21    (unintelligible) that it became a problem.

22    Not just a megaphone, a megaphone that was

23    able to project noise into a home on the

24    other side of the building.

25         And so the officer testified that

```
1          he'd been out there, he's been out there in

2          the past, and nobody's there stopping

3          anybody's message.  They're out there.  They

4          were out there specifically on that day and

5          didn't take any action until the noise

6          complaint came in.

7               So that's really the focus of the

8          case, the investigation, the charge.  It's

9          the noise, not the message.

10              THE COURT:  All right.  Thank you,

11         Mr. Plesich.

12              Rebuttal?

13              MR. HARRELL:  Very quick, Your Honor.

14         I want to be clear.  We should not be saying

15         the complaint.  It should be the complaints.

16              As far as Your Honor considering

17         information about it being so loud it

18         bounced off another side of a building, the

19         officer testified that all of that knowledge

20         was learned after the issuance of the

21         citation.  I don't think you should consider

22         it at this point.

23              Similarly, there was nothing on the

24         record at this point as to the officer's

25         expertise, that he may or may not have used,
```

1          and I think those points should not be

2          taken.  Thank you.

3                    THE COURT:  All right.  Thanks

4          everybody.  I will take it under advisement.

5          I will get something out as quick as I can.

6                    MR. HARRELL:  Appreciate it, Your

7          Honor.

8                    THE COURT:  Thanks, everybody.

9                    MR. PITCHFORD:  Thank you.

10         (Proceedings concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T E

I, KELLEY E. SPEARS, RPR, Certified Shorthand Reporter, Summit County, do hereby certify that I transcribed in Stenotypy the audiotaped proceeding held in the foregoing-entitled matter, and I do further certify that the foregoing-entitled TRANSCRIPT OF PROCEEDINGS, consisting of 57 typewritten pages, is a complete, true, and accurate record of said matter to the best of my skill and ability.

I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action.

_Kelley E. _____

KELLEY E. SPEARS, RPR
Certified Court Reporter