UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ZACHARY KNOTTS and LINDSAY KNOTTS, *Plaintiffs*, v. CITY OF CUYAHOGA FALLS, DYLAN PARATORE, in his individual and official capacities, and BRADFORD DOBNEY in his individual and official capacities, *Defendants*. | CASE NO.: 5:25-cv-01120 JUDGE JOHN R. ADAMS |

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AND INCORPORATED
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Pursuant to Rule 65, Fed. R. Civ. P., Plaintiffs move for a preliminary injunction against Defendants. The City of Cuyahoga Falls has adopted a facially unconstitutional and vague Ordinance restricting speech in a traditional public forum. In addition, Defendants have applied this Ordinance in a viewpoint-discriminatory manner, targeting only the Knotts as pro-life speakers, not pro-abortion escorts or protestors engaged in directly comparable speech. The Knotts suffered and are suffering irreparable injury from this violation of their constitutional rights. Harm to the Knotts exceeds any plausible harm to Defendants and a preliminary injunction is in the public interest. The Knotts seek a preliminary injunction to (1) block enforcement of Cuyahoga Falls City Ordinance § 509.03(a)(6) due to its facial unconstitutionality and (2) prohibit its unequal enforcement.

**STATEMENT OF FACTS**

Cuyahoga Falls City Ordinance § 509.03(a)(6) regulates disorderly conduct and prohibits "recklessly" being the cause of "inconvenience, annoyance, or alarm," by "[g]enerating or . . . permitting to be generated unreasonable noise or loud sound which is likely to cause inconvenience

or annoyance to persons of ordinary sensibilities by means of a radio, phonograph, television, tape player, loudspeaker or any other sound amplifying device or by any horn, drum, piano or other **musical or percussion instrument**." (Emphasis added). The ordinance exempts from its prohibition various organizations, such as "educational" or "charitable" organizations. *Id.*

Plaintiffs are pro-life advocates and sidewalk evangelists. Doc. 1, Verified Complaint, ¶¶ 23, 24. On December 28, 2024, the Knotts traveled to the Northeast Ohio Women's Center, ("NEOWC"), an abortion clinic in Cuyahoga Falls, to exercise their First Amendment rights by protesting the performance of abortions. *Id.* ¶ 35. Mr. Knotts brought a small battery-powered megaphone to amplify his message so that more people could hear it. *Id.* ¶ 44. Also present were several abortion clinic escorts actively drowning out the Knotts's speech through their own sound amplification devices. *Id.* ¶ 45.

To silence the Knotts and censor their message, escorts used sound-amplifying devices and musical instruments, such as whistles and kazoos, to drown out Mr. Knotts's message. *Id.* ¶ 46. Escorts repeatedly harassed the Knotts, aggressively shoving umbrellas in their faces. *Id.* ¶ 47. Mrs. Knotts filmed these actions. *Id.* ¶ 48. *See also* Lindsay Knotts Decl., Ex. 1. Escorts also made threats towards the Knotts. An escort told Mr. Knotts to "suck-start a shotgun." *Id.* ¶ 52.

The Knotts remained on the public sidewalk, a traditional public forum, for the duration of their protest, never approaching visitors on NEOWC property. *Id.* ¶¶ 49, 50. Mr. Knotts's amplified speech was drowned out by traffic and the escorts' musical instruments, such as kazoos and whistles. *Id.* ¶¶ 55-56. *See also* Lindsay Knotts Decl., Ex. 1 & 2. Someone who heard Mr. Knotts on the megaphone made a noise complaint requesting that the police force Mr. Knotts to "shut up." *Id.* ¶¶ 58-59. After Mr. Knotts's megaphone ran out of batteries, the Knotts continued their demonstration without amplification. *Id.* ¶ 57.

After the batteries died, Defendant police officers, Bradford Dobney and Dylan Paratore of the Cuyahoga Falls Police Department ("CFPD"), arrived in response to the noise complaint. *Id.* ¶ 61. Neither officer witnessed Mr. Knotts using the megaphone. *Id.* ¶¶ 62-65. Officer Dobney was aware of NEOWC's abortions, the Knotts's pro-life views, the escorts' hostility towards the Knotts, and that interactions would occasionally become heated. *Id.* ¶ 62. The officers only took a statement from CFPD officer Oldham, who was working off-hours as private security for NEOWC. *Id.* ¶ 63. Defendants questioned no other witnesses. *Id.* ¶ 64. Despite being aware of the escorts' threats and their noise-making activities, the officers took no action against any escort and none was cited. *Id.* ¶¶ 66-67. Mr. Knotts, however, was detained, placed in the back of the officers' police cruiser, and cited for violating Cuyahoga Falls City Ordinance § 509.03(a)(6). *Id.* ¶ 67.

In a conversation that occurred when the Knotts first visited the clinic, Mr. Knotts told escorts how his mother-in-law considered an abortion while she was pregnant with his now wife, and that if she went through with it, his wife "should be dead." *Id.* ¶ 37. An escort interrupted and stated, "we can fix that." *Id.* ¶ 38. While Mr. Knotts was arrested, Mrs. Knotts informed officers about the threats made against her and her husband. *Id.* ¶ 67. She was told these statements were "not a crime." *Id.*

The charges against Mr. Knotts were transferred to Stow Municipal Court, Case 2025 CRB 00069. *Id.* ¶¶ 69-73. On the day of trial, after extensive motions and trial preparation, the City dismissed the charges rather than proceeding with trial. *Id.* The Knotts continue to demonstrate outside NEOWC but since December 28, 2024, they have refrained from using any amplification out of fear of prosecution. *Id.* ¶ 68.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S.

7, 20 (2008). Here, however, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Ohio Citizen Action v. Englewood*, 671 F.3d 564, 571 (6th Cir. 2012) (quoting *United States v. Playboy*, 529 U.S. 803, 816 (2000)). Thus, even at this preliminary stage, Defendants must demonstrate that their restriction on speech is constitutional. *See Ashcroft v. ACLU*, 542 U.S. 656, 665–66 (2004) (holding government bears burden of proof at trial on constitutionality of challenged speech restriction, and plaintiff must be deemed likely to prevail at preliminary injunction stage unless government meets its burden); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("The burdens at the preliminary injunction stage track the burdens at trial.").

### I. The Knotts Are Likely to Succeed on the Merits.

Likelihood of success on the merits has long been recognized as the most important preliminary injunction factor, especially when a plaintiff alleges an injury to their First Amendment rights. "Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020). When state action strips people of First Amendment freedoms, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

The Knotts are likely to succeed on the merits for three reasons: (1) the City's Ordinance is an unjustified, content-discriminatory restriction on speech in a public forum; (2) the Ordinance is unconstitutionally overbroad; and (3) the Ordinance is enforced in a viewpoint-discriminatory manner. Any one of these reasons is sufficient to determine a likelihood of success on the merits.

#### A. The Ordinance is an unconstitutional restriction on free speech in a traditional public forum.

The Knotts protested, and continue to protest, on a public sidewalk. As the Sixth Circuit recently emphasized, "'because of their historic role as sites for discussion and debate,' streets and

sidewalks 'occupy a special position in terms of First Amendment protection.'" *Sisters For Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022) (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)). The Supreme Court has long held that, since "time immemorial," places like sidewalks, streets, and public parks have been considered a "traditional public forum for speeches and other transitory expressive acts." *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009). *See also Tucker v. Fairfield*, 398 F.3d 457, 460 (6th Cir. 2005) (holding that public right-of-way was a traditional public forum and affirming injunction against ban on temporary signs in that forum).

In such a public forum, "regulations or laws that are content based . . . are subject to strict scrutiny." *Norton Outdoor Advert., Inc. v. St. Bernard*, 99 F.4th 840, 847 (6th Cir. 2024) (citing *Reed v. Gilbert*, 576 U.S. 155, 163 (2015)). Strict scrutiny is exacting; it "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (quoting *FEC v. Wisc. Right to Life* 551 U.S. 449, 464 (2007)). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional[.]" *Reed*, 576 U.S. at 163.

In a traditional public forum, like the public sidewalk outside NEOWC, the government may enforce content-neutral time, place, and manner regulations of speech, but only if "they are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *McCullen*, 573 U.S. at 477 (citation omitted). Even a content-neutral regulation of speech, however, "is not something this country lightly allows." *Sisters For Life*, 56 F.4th at 404. "[T]he requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," and does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

Cuyahoga Falls Codified Ordinance Chapter § 509.03(a)(6) ("Disorderly Conduct") makes it

a crime to "recklessly cause inconvenience . . . by . . . [g]enerating . . . unreasonable noise or loud sound which is likely to cause inconvenience or annoyance or alarm to persons of ordinary sensibilities by means of a . . . loudspeaker or any other sound amplifying device or by any horn, drum, piano or other musical or percussion instrument." Importantly, it goes on to state what this Ordinance does *not* apply to:

> Shows and exhibitions for which a permit has been obtained pursuant to Chapter 753, parades for which a permit has been obtained pursuant to Section 311.02 of the Traffic Code, and live outdoor musical or theatrical performances or concerts conducted under the auspices of or on property owned by any educational, charitable, governmental or religious organization or live outdoor musical or theatrical performances or concerts conducted at any outdoor entertainment facility where such use is legal under the Zoning Code.

These exemptions transform an otherwise generally applicable law regarding conduct in a public forum into an unconstitutional one that discriminates based on speaker and therefore content. Importantly, it includes any conduct "under the auspices of . . . any educational, charitable, governmental or religious organizations." *Id.* These organizations are simply exempt from complying with the Ordinance. Cuyahoga Falls has not narrowly tailored this Ordinance to a compelling state interest. The Ordinance is therefore unconstitutional under the First Amendment.

A speech restriction is content-based if "'a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys.' That description applies to a law that 'singles out specific subject matter for differential treatment.'" *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 618-19 (2020) (internal citations omitted). "Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). "Speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.* "[S]uch laws 'demand strict scrutiny when the legislature's speaker preference reflects a content preference[.]'" *Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019) (quoting *Reed*, 576 U.S. at 170). "Characterizing a distinction as speaker based is only the beginning—not the end—of the

inquiry." *Reed*, 576 U.S. at 170. "The government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791 (1989). In the same vein, laws that regulate speech based on the "emotive impact of speech on its audience," are also content-based. *Boos v. Barry*, 485 U.S. 312, 321 (1988).

This principle is well-established. An exemption from an otherwise permissible regulation of speech may represent a governmental "attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 785-786 (1978). Alternatively, through the use of exemptions, the government might seek to select the "permissible subjects for public debate," to "control… the search for political truth." *Consol. Edison Co. of N. Y. v. Pub. Serv. Comm'n of N. Y.*, 447 U.S. 530, 538 (1980). This Ordinance remains speaker-, and therefore content-based in its treatment of different speech. "Educational, charitable, governmental or religious" institutions are allowed to amplify their speech with a blessing in the form of a specific exemption from the Ordinance. Nor can this be construed as a mere "place" restriction since the Ordinance exempts those organizations whether the noise is produced on their own property or "under the auspices of" their organization. Under the Ordinance, politically favored speakers have license to use amplification that most simply do not.

The U.S. District Court for the District of Idaho recently found a similarly worded statute to be content-based for this very reason. *See Sierra Club v. Boise*, No. 1:24-cv-00169-DCN, 2024 U.S. Dist. LEXIS 79719 (D. Idaho Apr. 29, 2024) (order granting preliminary injunction). Boise's Noise Control Code exempted the owners of "any outdoor Municipal, school, religious or publicly owned property or facility" from its ban on sound-amplification devices, "*regardless* of the location of the exempted property." *Id.* at 12. The court noted that a bakery and a church holding a joint bake sale would be in the ridiculous position where the bakery would be limited from the use of megaphones while "if the church wanted to use a megaphone to share the *same* message in the *same* general location, it could do so without any restrictions." *Id.* at 13 (emphasis in original). The court held that these categories

Page **7** of **16**

expressed a preference for "government-approved" and "religious messages," and it was unlikely the code would survive strict scrutiny. *Id.* at 13-14. The same logic applies here: an *individual* cannot engage in religious speech with a megaphone, but that exact same speech, for a religious *institution,* is given an imprimatur.

Nor is the governmental interest here "compelling." "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon & Schuster v. N.Y. Crime Victims Bd.*, 502 U.S. 105, 115 (1991)). "To be compelling, the interest must be of the 'highest order.'" *Blanken v. Ohio Dep't of Rehab. & Corr.*, 944 F. Supp. 1359, 1366 (S.D. Ohio 1996) (internal citations omitted).

The City's justification is in the text of the Ordinance: "No person shall recklessly cause inconvenience, annoyance or alarm to another[.]" Certainly, the government may wish to prevent inconvenience, annoyance, or alarm; but these interests cannot satisfy the standards of strict scrutiny. The Supreme Court has made it clear what categories of speech meet this highest standard: incitement, obscenity, defamation, speech integral to criminal conduct, so-called "fighting words," child pornography, fraud, true threats, and speech presenting some grave and imminent threats. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012). Inconvenience does not make the list.

The Ordinance's exemptions further discredit any governmental interest. A "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on . . . speech, when it leaves appreciable damage to that supposedly vital interest unprohibited[.]" *Republican Party of Minn. v. White*, 536 U. S. 765, 780 (2002). In short, the Ordinance's broad carve out for certain organizations belies the purported interests it claims to protect.

Assuming the City conjures up an argument that this speaker restriction is content-neutral, it

still fails First Amendment scrutiny. A time, place, or manner regulation of speech must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. The tailoring here is so broad as to be nonexistent. The Ordinance covers the entire city during all hours, at all places, and leaves no possible way for Mr. Knotts or another to deliver their message, as it leaves no room for any other amplification method. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495. The City of Cuyahoga Falls could easily implement narrower, more specific ordinances that provide sufficient alternatives, such as by specifically regulating based on decibel levels, for example, or a requirement that the noise be heard from a certain distance from the source of the noise, or by regulating sound at specific times. *St. Mark Roman Catholic Parish v. City of Phoenix*, 2010 U.S. Dist. LEXIS 145304, *49-50 (D. Ariz. 2010) ("The Noise Ordinance does not contain an objective standard, such as a decibel level, under which loud, disturbing, and unnecessary sounds are targeted."); *see Lionhart v. Foster*, 100 F. Supp. 2d 383, 384 (E.D. La. 1999) ("La. Rev. Stat. § 14:103.2 invites prosecution based on subjective factors or worse, distaste for the content of the sound and not its decibel level. Therefore, the statute is not narrowly tailored."); *see also McClellan v. City of Alexandria*, 363 F. Supp. 3d 665, 677 (E.D. Va. 2019).

A restriction may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. Therefore, Defendants "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.; see also McCullen*, 573 U.S. at 486. In *United States v. Doe*, 968 F.2d 86, 88 (D.C. Cir. 1992), the D.C. Circuit struck down an ordinance as not narrowly tailored in a public forum bustling with normal sounds, as the ordinance would have included within its scope many other ordinary activities, such as generators running in the very park at issue. A similar problem is evidenced

Page **9** of **16**

here; Plaintiff's speech was often quieter than even ambient traffic. Targeting that protected speech alone is accordingly more burdensome than necessary.

### B. The Ordinance is Unconstitutionally Broad and Vague Under the First Amendment.

A law is vague when it "fails to provide fair notice to those to whom it is directed." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991) (citing *Grayned v. Rockford*, 408 U.S. 104, 112 (1972)); *see also Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). A statute can be impermissibly vague where it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). A vague regulation of expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno*, 521 U.S. at 871–72. The Supreme Court regularly warns against vagueness towards First Amendment rights. *See, e.g.*, *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity…"); *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) (If "the law interferes with the right of free speech… a more stringent vagueness test should apply.").

   1. *<u>The Ordinance is Facially Overbroad.</u>*

The First Amendment prohibits vague laws that infringe on the right to speak. "A vague Ordinance denies fair notice of the standard of conduct to which a citizen is held accountable." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995) (quoting *Leonardson v. E. Lansing*, 896 F.2d 190, 196 (6th Cir. 1990)). *See NAACP v. Button*, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."). As the Supreme Court has reasoned:

> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that

> tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

*United States v. Williams*, 553 U.S. 285, 306 (2008) (citing *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971); *Reno*, 521 U.S. at n.35). If "a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" *Grayned*, 408 U.S. at 109.

The Ordinance prohibits "recklessly" being the cause of "inconvenience, annoyance, or alarm," by "[g]enerating . . . unreasonable noise or loud sound which is likely to cause inconvenience or annoyance to persons of ordinary sensibilities by means of a . . . loudspeaker or any other sound amplifying device or by any horn, drum, piano or other musical or percussion instrument." The Ordinance is vague in several key respects:

- The Ordinance fails to sufficiently define "unreasonable noise" or "loud sound;"
- The Ordinance does not define "inconvenience" or "annoyance;"
- The Ordinance does not define "ordinary sensibilities."

The key terms of the Ordinance leave vague and uncertain the conduct it purports to prohibit. The ordinary, reasonable person has no guidance as to what constitutes an "unreasonable noise," or what would cause "inconvenience." This enables precisely what occurred here: unequal enforcement. Mr. Knotts's noise was deemed "unreasonable," but not the escorts' equally noisy musical instruments, i.e., whistles and kazoos.

In *Coates v. Cincinnati*, 402 U.S. 611, 611 (1971), the Supreme Court likewise invalidated a statute that prohibited "annoying" conduct as overly broad. "Conduct that annoys some people does not annoy others. Thus, the ordinance is vague . . . in the sense that no standard of conduct is specified at all." *Id.* at 614. The ordinance in *Coates* failed to provide individuals with any ascertainable standard to determine whether their conduct would "annoy" passers-by. The same is true here; no ascertainable standard is given of annoyance.

### 2. *The Ordinance's Vagueness Invites Arbitrary, Discriminatory Enforcement.*

A law must not "vest[] unbridled discretion in a government official over whether to permit or deny expressive activity." *Lakewood v. Plain Dealer*, 486 U.S. 750, 755 (1988). The constitution forbids laws "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). *See Papachristou v. Jacksonville*, 405 U.S. 156, 170 (1972) ("Where… there are no standards governing the exercise of the discretion granted by the Ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law."). Generally, a "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51, (1969).

In *Niemotko v. Maryland*, the Supreme Court unanimously reversed the disorderly conduct conviction of persons who held religious meetings in a public park without permits. 340 U.S. 268 (1951). The Court emphasized that when enforcing regulations of speech, press, and religion, government officers need "narrowly drawn, reasonable and definite standards… to follow," or else the regulations are "invalid." *Id.* at 271. Justice Vinson noted that "[n]o standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power; [and] no substantial interest of the community to be served" before concluding that "use of the park was denied because of the City Council's dislike for or disagreement with the [the Defendants] or their views." *Id.* at 272.

The same applies here. This policy lacks a clear standard, as evidenced by its enforcement carried out against a particular viewpoint. The officers only cited and arrested Mr. Knotts, ignoring the abortion escorts making noise with comparable devices, i.e., musical instruments as specifically named by the Ordinance. The lack of objective standards leaves the Ordinance entirely to the unbounded discretion of police officers, inviting arbitrary enforcement. The First Amendment rights of the Knotts, and indeed all Cuyahoga Falls citizens, are left at grave risk. When officers told Mrs.

Knotts that the abortion escorts' actions were "not a crime," while her husband sat in a police cruiser, they demonstrated exactly why this Ordinance is unconstitutional: the officers had been vested with the personal discretion to decide what speech is permissible, based on subjective considerations like "annoyance." This is the arbitrary enforcement that the First and Fourteenth Amendments forbid.

### C. Defendants' Actions Unconstitutionally Discriminate Based on Viewpoint.

"In the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Univ. of Va.*, 515 U.S. 819, 828 (1995). A finding of viewpoint discrimination is dispositive in showing that government action is unlawful. *See Sorrell v. IMS Health*, 564 U.S. 552, 571 (2011); *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98, 106 (2001). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829; *see Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'") (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)).

Defendants have adopted a policy that implements their Ordinance in exactly such a manner. As highlighted above, the Ordinance is facially vague and ambiguous. In practice, Defendants implement the Ordinance to target religious pro-life speakers. The Knotts were exercising their constitutional rights mere feet from abortion escorts using whistles and kazoos, musical instruments within the terms of the Ordinance, to drown out Mr. Knotts's pro-life message. Lindsay Knotts Decl., Ex. 1. The Ordinance on its face applies to the conduct of the escorts here; it includes the use of a "sound amplifying device" or "musical or percussion instrument" within its prohibitions, and the noise of the escorts certainly caused annoyance to the Knotts. But no action about the escorts was taken by Defendants. To the extent the Knotts's conduct raised concerns about the Ordinance, the unequal enforcement is inexplicable, and amounts to a campaign of viewpoint discrimination.

Prosecuting one viewpoint but not the other is anathema to the First Amendment. Defendants may respond by arguing that the conduct of the Knotts caused "annoyance" in a way different from the actions of the escorts; but that would reveal the ordinance's inherent flaw: speech is protected or prosecuted depending on subjective considerations of undefined and amorphous terms.

## II. The Knotts will suffer irreparable harm absent relief.

The Sixth Circuit has regularly emphasized that irreparable harm is presumed when constitutional rights are violated. *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief."); *see also Dayton Area Visually Impaired Persons v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995); *G&B Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[V]iolations of [F]irst [A]mendment rights constitute per se irreparable injury."). "[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the issuance of a preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, "no substantial harm to others can be said to inhere [in the restriction's] enjoinment." *Brindley v. Memphis*, 934 F.3d 461, 472 (6th Cir. 2019) (citing *Bays v. Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012)).

Free, public expression "lies at the foundation of free government." *Schneider v. New Jersey*, 308 U.S. 147, 165 (1939). Deprivation of such rights constitutes, *a priori*, irreparable harm. Thus, when plaintiffs seek to enjoin speech restraints, likelihood of success on the merits is generally dispositive of their entitlement to an injunction. The ongoing loss of freedoms has a chilling effect on the Knotts and others in the public who are suffering discrimination and cannot be made whole by money damages. And here, that chilling effect includes threat of criminal prosecution.

## III. The Balance of Equities Favors Preliminary Injunctive Relief.

The balance of equities favors the Knotts. Preliminary injunctive relief ensures the Knotts stop

suffering discrimination against their rights during this suit's pendency. In contrast, Defendants suffer no harm whatsoever by any such order, nor can they claim an interest in unconstitutional enforcement. *See Elrod*, 427 U.S. at 373. The balance of the equities favors a plaintiff whose First Amendment rights are chilled and courts "cannot re-weigh the equities so as to undercut the First Amendment[.]" *Sisters for Life*, 56 F.4th at 409.

## IV.     The Injunction Is in the Public Interest.

Finally, the public interest also supports granting preliminary injunctive relief. Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles and that "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties." *Dayton Area Visually Impaired Persons v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995); see *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002) (listing cases). The protection of constitutional rights from infringement clearly outweighs any purported concerns of Defendants. The public interest is served by an injunction that preserves the constitutional rights of the Knotts while this lawsuit is ongoing.

## CONCLUSION

For these reasons, the Knotts respectfully request that the Court issue a preliminary injunction prohibiting Defendants from enforcing their unconstitutionally vague Ordinance against the Knotts's protected speech activities in a public forum.

Respectfully submitted,

**AMERICAN CENTER FOR LAW & JUSTICE**

| | |
|---|---|
| /s/ Abigail Southerland | Liam R. Harrell** |
| Abigail Southerland | Nathan J. Moelker** |
| 625 Bakers Bridge Ave., Ste. 105-121 | 201 Maryland Ave., NE |
| Franklin, TN 37067 | Washington, DC 20002 |
| Tel.: (615) 599-5572 | Tel.: (202) 855-1778 |
| Email: asoutherland@aclj.org | Email: lharrell@aclj.org; |
| NDOH Bar No. TN026608 | nmoelker@aclj.org |

*Counsel for Plaintiffs*

*\*\*pro hac vice applications forthcoming*