UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ZACHARY KNOTTS and LINDSAY KNOTTS, *Plaintiffs*, v. CITY OF CUYAHOGA FALLS, DYLAN PARATORE, in his individual and official capacities, and BRADFORD DOBNEY, in his individual and official capacities, *Defendants*. | CASE NO.: 5:25-cv-01120 JUDGE JOHN R. ADAMS |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF A PRELIMINARY INJUNCTION**

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Ohio Citizen Action v. Englewood*, 671 F.3d 564, 571 (6th Cir. 2012). Defendants have not done so; thus, Plaintiffs are likely to succeed on the merits, and the remaining preliminary injunction factors weigh against the Ordinance's continued enforcement. For those reasons, the Motion for Preliminary Injunction should be granted.

ARGUMENT

I. The Knotts Are Likely to Succeed on the Merits.

In *Saia v. New York*, the Supreme Court enshrined the right, subject to reasonable time, place, manner restrictions, to use a megaphone. 334 U.S. 558 (1948). Defendants' arguments cut against the Supreme Court's clear mandate in *Saia* and misapply First Amendment standards in an effort to rehabilitate a facially flawed and discriminatory Ordinance that allows some messages and disfavors others based on the speaker and message. Even more, Defendants almost ignore the as-applied aspect

of the Knotts' claims, based on clear discrimination on the part of the Cuyahoga Falls PD. The Ordinance, which facially discriminates based on speaker identity, was applied only to Plaintiffs, and not to the comparable musical instruments of speakers with the opposite viewpoint.

### A. Defendants' explanation of the Ordinance's exemption demonstrates the Ordinance's content-based nature.

The core of Plaintiffs' argument is that the Ordinance's section (a)(6)(B)(2) exemption for certain groups constitutes speaker-based, and thus content-based, discrimination, rendering the entire ordinance invalid. Doc. 3 at pp. 8-9. To distinguish a very similar case, in which a federal court issued a preliminary injunction, Defendants argue: "In *Sierra Club*, the exemptions applied to **all sounds** emanating from a megaphone. Here, the Ordinance's exemptions are only applicable in the context of '**live outdoor musical or theatrical performances or concerts**'[.]" Doc. 12 at pp. 7-8 (discussing *Sierra Club v. City of Boise*, 2024 U.S. Dist. LEXIS 79719 (D. Idaho Apr. 29, 2024)) (emphasis in original). Plaintiffs completely agree with this characterization of the Ordinance's exemption. The content-based discrimination here is worse here than in *Sierra Club*. In claiming the Ordinance distinguishes between the content of sounds that are or are not censored, Defendants emphasize, rather than diminish, Plaintiffs' point.

Under the Ordinance, speech is doubly privileged based on its content: first, it is privileged based on the type of speech (musical or theatrical), and second, based on the identity of the speaker (specific types of entities). As Plaintiffs discussed at length in their Motion, this speaker-based discrimination raises alarms under the First Amendment. A regulation based on either the message or the nature of the speaker is an unconstitutional restriction on speech. *See, e.g.*, *Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019). Doing both is hardly a defense.

Defendants argue that the Ordinance allows for speech "where the use is legal under the Zoning Code or a permit is obtained." Doc. 12 at p. 8. Requiring others to acquire a permit is no constitutional solution. Regardless, this contention is unsupported by the Ordinance's text. The

content it provides an exception for is any such speech "under the auspices" of the organization. According to the words of the Ordinance, an "educational" organization can play music wherever it wants, but identical speech is prohibited for other speakers.

Defendants have also failed to identify a sufficient interest. While the Government certainly has an interest in curtailing unwelcome noise, the comparison to *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), is inapt. *Ward* involved a literal rock music program that had received numerous complaints over the years, *id.* at 785; the instant case involves a small battery-operated megaphone. Without the megaphone, the Knotts cannot even be heard over ambient traffic. Doc. 1 at ¶ 56. In fact, the megaphone could not even be heard over the abortion escorts' sound devices, devices that received no enforcement action. *Id.*

### B. The Cuyahoga Falls Ordinance is far more vague than the ordinances discussed in *Dorso* and *Gaughan*.

Defendants rely on a presumption of constitutionality. No such presumption exists when it comes to the First Amendment. Instead, courts presume the opposite: "the State has a heavy burden to demonstrate that the limitation" it proposes is justified under the First Amendment. *Joseph Burstyn v. Wilson*, 343 U.S. 495, 504 (1952). Defendants cannot meet this burden. The Ordinance here fails to define its key terms, leaving the ordinary person with no guidance as to what constitutes an "unreasonable noise," or what would cause "inconvenience" or "annoyance."

The Cincinnati Ordinance that was upheld by the Ohio Supreme Court in *State v. Dorso*, 446 N.E.2d 449 (Ohio 1983), and the Cleveland Ordinance that was upheld by the Sixth Circuit in *Gaughan v. City of Cleveland*, 212 F. App'x. 405 (6th Cir. 2011), are far clearer than the Cuyahoga Falls Ordinance at issue here. The Cincinnati Ordinance prohibited amplified sound that would "disturb the peace and quiet of the neighborhood, having due regard for the proximity of places of residence, hospitals or other residential institutions and to any other conditions affected by such noises." *Dorso*, 446 N.E.2d at 450. That ordinance explained who must be disturbed, included geographic language as to where

the ordinance applies, and gave details as to what sounds were prohibited. These features are analyzed in depth in *Gaughan*, 212 F. App'x. at 410-11. Similarly, the Cleveland Ordinance was limited to sounds amplified in "such a manner or at such volume as to annoy or disturb the quiet, comfort or repose of neighboring inhabitants." *Id.* at 409. The *Gaughan* Court discussed at length the terms "quiet, comfort or repose" and "neighboring inhabitants." *Id.* No such clarification or specification is present here.

In other words, *Gaughan*, an unpublished decision, is far from saying that a mere "reasonable person" catchphrase saves an ordinance; it discusses in depth how the ordinance in Cleveland and Cincinnati were geographically and methodically specific with terms that could guide a finder of fact. As explained in Plaintiff's Motion, the Cuyahoga Falls Ordinance falls far short of these standards and simply is not parallel to legal standards with specific definitions. Doc. 3 at I.B.1. *Gaughan* emphasized the narrow scope of its holding: "Unlike [in] *Coates* . . . we are not left with the mere words of the ordinance, but are guided by a narrow construction of the statute." *Gaughan*, 212 Fed. Appx. at 412. No such narrow construction is available here, and we are left with the bare, unspecified words of the Ordinance. Defendants' reliance on the construction of other, dissimilar statutes does not address the specific construction of this statute, which Defendants concede has not been so construed or addressed by the Ohio courts. *Coates* governs and emphasizes that "[c]onduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).

### C. Defendants fail to grapple with their viewpoint discrimination.

When Sgt. Dobney arrived at the Northeast Ohio Women's Center (NEOWC) on December 28, 2024, every investigative effort was narrowly directed in a single direction: at Mr. Knotts. Parties concede that a complaint had been alleged only against Mr. Knotts. Doc. 1 at ¶¶ 59-61; Doc. 12 at p. 13. The record, though, clearly shows that at the time Mr. Knotts was arrested, officers had ample

evidence of violation of the same Ordinance by NEOWC escorts. Doc. 1 at ¶ 62, 66. These escorts were playing musical instruments (conduct directly within the scope of the Ordinance). Plaintiffs complained about their conduct, *see* Doc. 1 at ¶¶ 46, 67, but to no response. Moreover, the only statement taken at the scene was from an employee of NEOWC, and Mrs. Knotts' concerns were actively ignored. *Id.* at ¶¶ 63-68. Defendants' only defense to these problematic facts is the 911 call with no discussion of the remainder of the record. This argument cannot refute Plaintiffs' as-applied challenge which demonstrates the Ordinance's excessive vagueness, inviting arbitrary enforcement, and a demonstration of Defendants' pattern of arbitrary enforcement.

## II. The Remaining Factors All Lean Heavily in Favor of Free Expression

The Sixth Circuit is clear that "violations of [F]irst [A]mendment rights constitute per se irreparable injury." *G&B Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Constitutional violations create an inherent presumption of irreparable harm.

The irreparable injury remains, despite Plaintiffs' continued demonstration. The Knotts' continued demonstrations are without amplification for one sole reason: the explicit threat of arrest from Cuyahoga Falls PD. Doc. 1 at ¶ 61. Plaintiffs are not required to violate the Ordinance and face prosecution to establish standing, and Defendants' counterargument ignores the chilling effect doctrine. This ongoing threat chills constitutional expression in a way that simply can never be rectified through money damages. The government cannot escape First Amendment scrutiny simply because its actions "can somehow be described as a burden rather than outright suppression." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000).

Defendants invoke "the will of the people" to argue that the balance of equities and the public interest weigh against issuing an injunction. Constitutional rights are not subject to majoritarian override. Courts "cannot re-weigh the equities so as to undercut the First Amendment[.]" *Sisters For Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 409 (6th Cir. 2022). Nor can "substantial harm to

others [] be said to inhere [in a speech restriction's] enjoinment." *Brindley v. Memphis*, 934 F.3d 461, 472 (6th Cir. 2019). Contrary to Defendants' assertion, enjoining unconstitutional action preserves the proper status quo—the constitutional order where speech restrictions must comply with First Amendment standards from which all Americans benefit.[1] Courts have consistently recognized "the significant public interest in ensuring equal protection of the laws and protection of First Amendment liberties." *Dayton Area Visually Impaired Persons v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995). The public interest is never served by enforcing unconstitutional restrictions on free expression.

## CONCLUSION

The Knotts respectfully request that the Court issue a preliminary injunction prohibiting Defendants from enforcing their unconstitutionally vague Ordinance.

Respectfully submitted,

**AMERICAN CENTER FOR LAW & JUSTICE**
Abigail Southerland TN026608
Nathan J. Moelker VA98313
Liam R. Harrell DC1740309

201 Maryland Ave., NE
Washington, DC 20002
Tel.: (202) 855-1778
Fax: (202) 546-9309
Email: lharrell@aclj.org

---

[1] In fact, contrary to Defendants' assertion that the Knotts are putting "personal interests before those of other members of the community," (Doc. 12 at pp. 1, 14), it is deeply enshrined in our liberal democratic tradition (not to mention the First Amendment) that exposure to unpopular speech is in the community's interest. "[T]he peculiar evil of silencing the expression of an opinion… is robbing the human race… those who dissent from the opinion, still more than those who hold it." John Stuart Mill, *On Liberty* in *43 Great Books of the Western World: John Stuart Mill* 267, 275 (Mortimer J. Adler ed., Encyclopædia Britannica 1952). "To suppress free speech is a double wrong. It violates the rights of the hearer as well as those of the speaker." Frederick Douglass, *A Plea for Free Speech in Boston* (1860), https://frederickdouglasspapersproject.com/s/digitaledition/item/9060 (last visited June 24, 2025).